# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| KAREN A. COSS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 15 C 6654 |
| v. | ) | |
| | ) | Judge Jorge L. Alonso |
| BRIGGS HEALTHCARE d/b/a D-M-S | ) | |
| HOLDINGS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Karen A. Coss, sues defendant, Briggs Healthcare ("Briggs"), her former employer, for discrimination and hostile work environment on the basis of sex under Title VII, 42 U.S.C. §§ 2000e *et seq.* This case is before the Court on defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the following reasons, the Court grants the motion.

## BACKGROUND

Since the early nineteen-nineties, plaintiff has worked in various positions within the field of pharmaceutical and medical sales, for a number of different employers. (Def.'s App. at 59-62, Pl.'s Dep. at 14:12-27:21, ECF No. 24 at 62-65.) Briggs produces and distributes medical supplies and other healthcare products. (Pl.'s LR 56.1 Resp. ¶¶ 3-4, ECF No. 33.) On September 4, 2012, Briggs hired plaintiff as a Regional Director of Sales. (*Id.* ¶ 8.) As a regional director, plaintiff had both management and sales responsibilities; that is, she was expected to personally perform sales duties in order to grow major accounts, and she was also responsible for the development and performance of other sales professionals who reported to her. (*Id.* ¶ 11.) Plaintiff reported to the Senior Vice President of Sales and Marketing, Brad Mueller. (*Id.* ¶ 10.)

In March 2013, Mueller conducted plaintiff's first year-end review, and he rated her performance through the end of the 2012 calendar year as an overall 2.9 out of 5. (*Id.* ¶ 13.) In the review, Mueller wrote that plaintiff "excelled at getting appointments at several retailers" with whom Briggs had previously struggled to make inroads, but "she needs to now convert [the appointments] into new sales." (Pl.'s Dep. at 85:2-9.) Plaintiff felt that this review was "as fair as it [could] be," given that it was based on only a few months' work, when plaintiff was "still fairly new" and "still learning the ropes." (*Id*. at 86:9-12.)

In the following months, Mueller became dissatisfied with plaintiff's "failure to achieve her sales numbers" and "[g]eneral lack of progress." (Def.'s App. at 46, Mueller Dep. at 95:18-96:18.) Mueller explained to plaintiff in conversations in June and July 2013 that she was not on track to meet her sales goals, she was struggling to keep up with information tracking and documentation tasks, and she was not taking responsibility for training and managing the salespersons who reported to her. (Def.'s App. (Vol. 2) at 194, PIP at 1, ECF No. 25 at 52.) Plaintiff did not immediately make progress in these and other areas he had identified as needing improvement in plaintiff's 2012 year-end review, so, in August 2013, Mueller formally placed plaintiff on a Performance Improvement Plan ("PIP"). Mueller set forth performance expectations for the next thirty days, which included meeting plaintiff's "PPOs," or personal performance objectives (*see* Mueller Dep. at 96:3), and plaintiff prepared an "action plan" to improve her performance. (Def.'s App. at 195, PIP at 2.) Plaintiff knew that if she did not make satisfactory progress in turning around her performance within the thirty-day period set forth in the PIP, termination was a potential consequence. (Pl.'s Dep. at 144:13-145:7.) In a September 2013 email, Mueller notified Chief Executive Officer Bruce Dan that plaintiff would likely be terminated, pending the outcome of the PIP process. (Pl.'s LR 56.1 Resp. ¶ 30.)

Plaintiff did not sign the PIP because she "didn't agree with the majority of it." (Pl.'s Dep. at 117:17-21.) Specifically, she did not agree that she was not spending enough time getting in front of customers or that she was spending too much time on what should have been low-priority tasks. (*Id.* at 118:13-16, 119:23-120:8.) She admitted that the expectations Mueller had set forth on page two of the PIP were reasonable (*id.* at 121:16-122:1), but she believed he was "unrealistic" about how long certain administrative tasks were likely to take. (Pl.'s LR 56.1 Resp. ¶ 17.)

Plaintiff recognized that, as of the time of her July 2013 conversation with Mueller, she was "probably behind" the pace required to meet her annual sales goals (Pl.'s Dep. at 94:14), but she felt her job performance was "adequate" under the circumstances, and she felt the PIP "singled [her] out," despite the fact that there were "other people who didn't have [sales] numbers either" (*id.* at 94:22-95:2, 107:7-8). At her deposition, plaintiff could not think of another salesperson who would have been an "apples to apples" comparison, considering differences in such things as the "account base, customer needs, customer dollars, [and] spend sales," but she felt that "the gentle[men] that [she] competed against and worked with were given more resources," including "more leverage via availability of product." (*Id.* at 107:24, 109:1-5.) She stated that in one instance she was unable to fulfill her customer Topco's request for blood pressure monitors because another Regional Director of Sales, Bill Brantman, "took the inventory." (*See id.* at 109:4-117:16.) She did not recall whether she had forecast the sale she was trying to make to Topco in advance, whether Brantman needed the inventory for a sale he had forecast, how many blood pressure monitors were at issue, or how much of a financial impact that lost sale had; nor could she recall any other situations in which she could not complete a sale due to inventory being earmarked for another salesman's customers. (*Id.* at 116:2-9, 116:24-117:16.)

After the PIP was imposed, plaintiff followed the steps for improvement outlined in her action plan, but "they didn't maybe result in the exact sales numbers" she had hoped. (*Id.* at 126:10-17; *see also id.* at 144:13-16.) She succeeded in growing weekly sales at customer HD Smith by $1,819.65 to a total of $4,355.71 in September 2013 (Pl.'s LR 56.1 Resp. ¶ 19), but this was still woefully short of the monthly pace that would be required to hit the yearly forecast (or "pipeline," in Briggs jargon) target of $580,622 for that customer (Pl.'s Dep. at 127:17-131:2). Although plaintiff recognized that the "financial[]" goals of her PIP "may not have been met" by the end of the thirty-day period, Mueller extended the PIP, rather than terminate plaintiff, because it appeared that plaintiff was on the verge of closing significant deals with Walgreens and Target to carry Briggs's Switch Sticks, a folding walking-stick product. (Pl.'s LR 56.1 Resp. ¶ 20.)

In January 2014, Briggs promoted Brantman and Chuck Liston, the other Regional Directors of Sales, who had both exceeded their 2013 goals. (*Id.* ¶¶ 21, 45-46; Mueller Dep. at 101:23-102:3.) Plaintiff remained in her old position and Brantman became her immediate supervisor, with Mueller still above both of them in the corporate hierarchy. (Pl.'s LR 56.1 Resp. ¶ 21.) Because he had supervised her throughout 2013, Mueller performed plaintiff's 2013 performance review, and he gave her a rating of 1.7 out of 5. (*Id.* ¶ 23.) Plaintiff admitted that she did not totally disagree with Mueller's evaluation, "[n]ot 100 percent." (*Id.*)

In February 2014, plaintiff learned that Walgreens had declined to expand the number of stores carrying Switch Sticks, contrary to her expectation, and to Mueller's great displeasure. (*Id.* ¶ 25.) The expected Switch Sticks expansion never materialized at Target, either. (Def.'s App. at 238, Pl.'s Email to Greg Bollinger.)

Plaintiff's relationship with Mueller had been fraught for some time; they had disagreed over the issues Mueller described in his reviews as well as a few others. Plaintiff attempted to

resign in July 2013, but Mueller encouraged her to stay. (Pl.'s LR 56.1 Resp. ¶ 14.) Plaintiff offered to resign again in December 2013 or January 2014 because "it seemed apparent that it wasn't the right fit" (Pl.'s Dep. at 160:6-7), but still she stayed on. (Pl.'s LR 56.1 Resp. ¶ 22.)

In January 2014, plaintiff asked Mueller to make a sales presentation to Walgreens so that she could instead attend a trade show that day, but Mueller asked another salesperson to make the presentation, which plaintiff interpreted as a sign of "disrespect." (Pl.'s Dep. at 172:3-174:4, Ex. 20.) Plaintiff attempted to resign yet again over the incident, but again she stayed on. (Pl.'s LR 56.1 Resp. ¶ 29.) In February 2014, Mueller became incensed when he learned that plaintiff was not planning to attend a trade show that he thought she should attend as the salesperson assigned to the Ace account, but that plaintiff thought another salesperson could capably handle. (Pl.'s Dep. Ex. 22.) Mueller removed plaintiff from the Ace account and replaced her with another salesperson, Mike Svetina. (Pl.'s LR 56.1 Resp. ¶¶ 27-28.) In March 2014, Mueller instructed plaintiff to lower some of the ratings she had given a subordinate, Sandi Oerter, in her performance review, which plaintiff felt was unjustified. (Pl.'s Dep. at 184:1-189:9.)

On March 10, 2014, plaintiff met with Brantman, who told her that she was being terminated because her position was being eliminated. (*Id.* ¶¶ 30-31.) At the time, plaintiff believed that the decision was driven by her poor sales numbers, but she soon saw that her accounts were being taken over by a man, and she came to believe that she had been terminated based on her sex. (*Id.* ¶ 32.)

In late March 2014, although she had already been terminated, plaintiff joined a number of Briggs employees in lodging a formal complaint against Mueller for "abusive behavior." (*Id.* ¶ 34.) The joint complaint letter stated that both men and women were subject to "bullying and intimidation" from Mueller, but that women were the "predominate group" to receive his "abuse."

(*See* Def.'s App. (Vol. 2) at 244-45, Pl.'s Dep. Ex. 27; *see also* Pl.'s Dep. Ex. 26; Pl.'s LR 56.1 Resp. ¶¶ 34-35.) According to the letter, Mueller managed the authors and other employees "through serious intimidation and harassment evidenced in emails, in person and [in some cases] publicly in staff meetings and monthly operating reviews," with the "intent to do harm and to make [the employees] feel vastly inferior." (Def.'s App. (Vol. 2) at 244, Pl.'s Dep. Ex. 27.) The authors complained of being "constantly criticized, constantly told [they] do nothing right and constantly scrutinized," as well as sometimes "publicly ridiculed in front of . . . peers." (*Id.*) They complained of being forced to lower performance reviews for subordinates and of demotions, reduced responsibilities, and being passed over for promotion. (*Id.*)

Plaintiff submitted her own individual complaint memo against Mueller, dated April 7, 2014, to Chief Financial Officer Tom Young and Human Resources Manager Deb Nordaas, who were investigating Mueller's conduct. (Pl.'s LR 56.1 Resp. ¶ 36.) In this memo, plaintiff complained of "offensive conduct" consisting of "put downs and insults in front of peers, including "continued negative comments" about plaintiff's sales performance, and circumventing plaintiff to micromanage her direct reports. (Def.'s App. at 246, Pl.'s Dep. Ex. 28.) As examples of his overbearing behavior, plaintiff mentioned her disputes with Mueller over whether she should spend more time in front of potential customers and less time on administrative tasks, which plaintiff claimed was unrealistic because the administrative tasks were time-consuming and burdensome, as well as his interference with her management of Sandi Oerter. (*Id.* at 246-47.)

Young and Nordaas ultimately concluded that Mueller treated employees in a "degrading and unprofessional" manner, and pressure to achieve "unrealistic sales goals" was filtering down to departments Mueller supervised, but there was "no evidence of any discrimination between sexes." (Pl.'s LR 56.1 Resp. ¶¶ 38, 40; *id.*, Ex. A, April 22, 2014 Email from Tom Young to Bruce

Dan, ECF No. 33 at 24.) Although Mueller promoted plaintiff's co-Regional Directors of Sales, Bill Brantman and Chuck Liston, over plaintiff (*id.* ¶¶ 43-44), Mueller had also promoted a woman, Vicky Mitchell, to Senior Vice President of Marketing (*id.* ¶ 39), and he had fired male employees for underperforming (*id.* ¶ 42).

During plaintiff's employment, Mueller made a number of "sexist" comments to her about female employees' appearance. (*Id.* ¶ 48.) At or after a trade show, he mentioned to plaintiff that such "physical attributes" as "big boobs" or a "nice rack" were useful in attracting attendees to the company's booth. (Pl.'s Dep. at 221:2-223:19). Plaintiff seemed to recall that Mueller made "general comments" asserting that there were "females in the office that weren't as attractive," and if he could "get rid of them," he would, but she could not remember specific examples except that, on one occasion, he told plaintiff that a particular female employee was a "disgusting pig" who "wouldn't be here if [he] had anything to do with it." (*Id.* at 223:23-224:13.) He told plaintiff that another employee "wasn't put together" in terms of how she dressed, and suggested that plaintiff "should take her out shopping"; additionally, her posture in meetings "wasn't ladylike." (*Id.* at 224:8-13.) Plaintiff reported some of these comments to a human resources representative during her employment at Briggs. (*Id.* at 258:17-260:24.)

On October 29, 2014, plaintiff filed a charge of discrimination against Briggs before the EEOC, and she received a right to sue letter on May 1, 2015. On July 29, 2015, plaintiff filed this lawsuit.

## ANALYSIS

To prevail on a summary judgment motion, "the movant [must] show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." *Modrowski v. Pigatto*, 712 F.3d 1166, 1167 (7th Cir. 2013). The Court construes all facts and draws all reasonable inferences in favor of the nonmoving party. *Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016).

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). On a defendant's motion for summary judgment in an employment discrimination case, "the correct standard . . . is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the . . . adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). The Court must consider the evidence as a whole to determine whether the full evidentiary picture permits a reasonable inference that plaintiff's sex caused defendant to harass her and discharge her. *See id.*; *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994). Whether the evidence is direct or circumstantial, "the question remains: has the non-moving party produced sufficient evidence to support a jury verdict of intentional discrimination?" *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017) (citing *Morgan v. SVT, LLC*, 724 F.3d 990, 997 (7th Cir. 2013) ("The central question at issue is whether the employer acted on account of the plaintiff's [sex or other protected characteristic].")).

# I.    DISCRIMINATORY DISCHARGE

A plaintiff who has been discharged "can surmount summary judgment if a reasonable factfinder could conclude that the plaintiff's [sex or other protected characteristic] caused the discharge." *Williams v. Office of Chief Judge of Cook Cty. Ill.*, 839 F.3d 617, 626-27 (7th Cir. 2016). Plaintiff admits that she lacks direct evidence of discrimination, so she relies on the *McDonnell-Douglas* burden-shifting framework, which permits her to proceed based on circumstantial evidence as follows:

> [Plaintiff] must first establish a prima facie case of intentional discrimination by showing that (1) she is a member of a protected class; (2) she was meeting defendants' legitimate performance expectations; (3) defendants took materially adverse employment actions against her; and (4) defendants treated her differently than similarly-situated employees outside her protected class. *See, e.g., Fane v. Locke Reynolds, LLP,* 480 F.3d 534, 538 (7th Cir. 2007). "[A]fter the plaintiff makes a prima facie case of discrimination or retaliation, the burden shifts to the employer to articulate a legitimate non-discriminatory reason for its action. Doing so shifts the burden back to the plaintiff to show that the employer's proffered reason is pretext, which then permits an inference that the employer's real reason was unlawful." *Johnson* [*v. Gen. Bd. of Pension & Health Benefits of United Methodist Church,* 733 F.3d 722, 728 (7th Cir. 2013)].

*Williams v. Office of Chief Judge of Cook Cty., Ill.*, No. 13 C 1116, 2015 WL 2448411, at *14-15 (N.D. Ill. May 21, 2015). Defendant admits that plaintiff is a member of a protected class (a woman) who suffered a materially adverse employment action (discharge from employment), but it argues that plaintiff was not meeting defendant's legitimate performance expectations, nor was she treated worse than similarly-situated co-workers—and even if she had been, her poor performance provided a legitimate, non-discriminatory reason for terminating her. Plaintiff rejects defendant's contentions and argues that defendant's assertion that she was not meeting legitimate performance expectations is a pretext for discrimination.

In a case such as this, because plaintiff argues that defendant is "lying about its legitimate employment expectations in order to set up a false rationale for terminating [her,] the question of

whether [s]he was meeting [defendant's] legitimate expectations merges" with the question of pretext, and the Court may focus on pretext from the start. *Senske v. Sybase, Inc.*, 588 F.3d 501, 507-08 (7th Cir. 2009). Plaintiff may demonstrate pretext either "directly by showing that 'a discriminatory reason more likely motivated' [her] termination, or indirectly by showing that [defendant's] explanations are 'unworthy of credence.'" *Id.* (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). "To show that [defendant's] explanations are not credible, [plaintiff] must point to evidence that they are not the real reasons it fired [her], have no grounding in fact, or are insufficient to warrant the termination decision." *Senske*, 588 F.3d at 507. The ultimate question is always whether "the same events would have transpired" if plaintiff had been a man, but everything else had remained the same. *See id.*

Plaintiff does not argue that there is any direct evidence of an intent to discriminate against her based on sex, and she has not come forward with circumstantial evidence showing that defendant's reason for terminating her was fabricated, groundless, or insufficient to warrant termination. The only example she gives of growing sales after being placed on her PIP (*see* Pl.'s LR 56.1 Resp. ¶ 19) relates to a single account, HD Smith, and even with the growth, plaintiff fell far short of her sales target for that account. (*See* Pl.'s Dep. at 127:17-131:2.) Plaintiff does not genuinely dispute that her sales numbers were inadequate because she did not meet the sales targets that were set for her. That is a perfectly legitimate reason for termination. *See Senske*, 588 F.3d at 507-08.

To the extent plaintiff's position is that the expectations placed upon her were unreasonable or that her poor sales numbers were not the real reason for her termination, she relies on the following evidence: (a) Brantman and Liston were promoted ahead of her; (b) Brantman was "given more resources" to succeed, including "more leverage via availability of product" when

blood pressure monitors plaintiff wanted to sell to one of her customers were "allocated to" Brantman (Pl.'s Dep. at 109:1-5, 111:21), and (c) the sales expectations placed on plaintiff were not reasonable because plaintiff "was responsible for $17,000,000 in business even though Briggs never had reached that level" (Pl.'s LR 56.1 Resp. ¶ 30).

    *a.   Brantman and Liston—similarly situated but treated differently*

Plaintiff argues that Brantman and Liston were similarly situated to plaintiff because they initially held the same position, but they were treated differently because they were promoted ahead of her.

The similarly-situated inquiry is a flexible, common-sense one that depends on the factual context; there is no "'magic formula for determining whether someone is similarly situated.'" *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 405 (7th Cir. 2007) (quoting *Chavez v. Ill. State Police*, 251 F.3d 612, 636 (7th Cir. 2001)). "[T]he purpose of the similarly situated requirement is to eliminate confounding variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable"—in this case, the employee's sex. *Humphries*, 474 F.3d at 405. "[D]istinctions can always be found in particular job duties or performance histories or the nature of the alleged transgressions . . . , but the fundamental issue remains whether such distinctions are so significant that they render the comparison effectively useless." *Id.*

In this case, the Court agrees with Briggs that the comparison plaintiff makes between herself and Brantman and Liston is "untenable because she has not come forward with evidence that [they] shared a 'comparable set of failings' with her." *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 642-43 (7th Cir. 2008) (quoting *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006). Put simply, Brantman and Liston did not struggle with their sales, unlike plaintiff; in

fact, they exceeded expectations in 2013, which is why they were promoted at the end of that year. The "confounding variable" of the purported comparators' disparate performance histories undermines any inference that their disparate treatment was based on sex discrimination.

    *b.   "More leverage via availability of product"*

Plaintiff also asserts that she was treated differently from Brantman when, in one instance, she was unable to fulfill her customer Topco's request for blood pressure monitors because Brantman "took the inventory." (*See* Pl.'s Dep. at 109:4-117:16.) Plaintiff is vague about exactly how this alleged preferential treatment occurred: as the Court explained above, plaintiff does not recall whether she had forecast the sale she was trying to make to Topco, whether Brantman had forecast the sale he allegedly needed the inventory for, how many blood pressure monitors were at issue, or how much of an impact that lost sale had on plaintiff's overall sales numbers; nor could she recall any other situations in which she could not complete a sale due to inventory being earmarked for another salesman's customers. (*Id.* at 116:2-9, 116:24-117:16.) Without evidence showing how this incident affected plaintiff's overall sales numbers, the isolated incident does not show that preferential treatment of male salespersons caused plaintiff to fall short of performance expectations. Similarly, without evidence showing some reason for believing that the incident betrays a discriminatory intent rather than a non-discriminatory scarcity of inventory, this isolated incident is not sufficient to show that plaintiff was failing to meet expectations only due to preferential treatment of other salespersons or because the expectations placed on her were illegitimate.

    *c.  Unreasonable sales targets*

Plaintiff argues that the sales expectations placed on plaintiff were not reasonable because plaintiff "was responsible for $17,000,000 in business even though Briggs never had reached that

level." (Pl.'s LR 56.1 Resp. ¶ 30; *see* Pl.'s Mem. in Opp'n at 4, ECF No. 32.) Plaintiff clarified at her deposition that the $17,000,000 figure was "an overall team number" for her region, not her "particular sales goal." (Pl.'s Dep. at 41:13-21.) While this figure is consistent with the evidence that there was general "pressure to reach unrealistic sales goals on Mueller, which "filtered down" to the employees who reported to him " (Pl.'s Mem. in Opp'n, Ex. A, ECF No. 33 at 24), it does not indicate that plaintiff was singled out for unrealistic expectations. In fact, according to Mueller, this was quite normal; the general rule was that sales targets were set precisely by taking prior-year sales numbers for the relevant accounts and asking the sales team to improve upon them. (*See* Mueller Dep. at 97:6-99:10)

Any inference that any disparate treatment plaintiff may have received was based on sex discrimination is further undermined by evidence showing that Briggs both promoted another woman (Vicky Mitchell) and fired male salespersons who underperformed. Plaintiff may well have been a talented and experienced salesperson for whom a few deals unfortunately did not work out, and perhaps Briggs's ambitious sales targets and impatience with plaintiff's slow sales growth were ill-advised business decisions, but it does not follow that her low sales were such a suspicious reason for firing her that a jury could reasonably infer discrimination on the basis of sex. *See Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000) ("The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered."); *see also Nicholson v. City of Peoria, Ill.*, 860 F.3d 520, 524 (7th Cir. 2017) ("Federal courts intervene in these sorts of personnel disputes 'only where an employer's reason for [an adverse action] is without factual basis or is completely unreasonable.'") (quoting *Burton v. Bd. of Regents of Univ. of Wis. Sys.*, 851 F.3d 690, 698 (7th Cir. 2017)); *Culver v. Gorman & Co.*, 416 F.3d 540, 547 (7th Cir. 2005) ("As has been regurgitated *ad nauseam,* [a federal court] is not a 'super

personnel review board' that second-guesses an employer's facially legitimate business decisions.") (quoting *Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 532 (7th Cir. 2003)).

In summary, the Court agrees with defendant that the evidence shows that plaintiff was not meeting the performance expectations set for her, particularly with respect to her personal sales targets. Plaintiff has not come forward with evidence raising a genuine question of fact as to whether these performance expectations were illegitimate or whether defendant's assertion that she failed to meet them was a pretext for discrimination. The Court grants defendant's motion for summary judgment on plaintiff's discriminatory discharge claim.

## II.    HOSTILE WORK ENVIRONMENT

An employer may be liable for discrimination, within the meaning of Title VII, if an employee is subject to a hostile work environment based on any of the characteristics enumerated by the statute. *See Mason v. S. Ill. Univ. at Carbondale*, 233 F.3d 1036, 1043 (7th Cir. 2000). To prevail on a hostile work environment claim, the employee must show that (1) she was subject to unwelcome harassment, (2) the harassment was based on membership in a protected class, (3) the harassment was so severe or pervasive as to alter the conditions of the employee's environment and create a hostile or abusive working environment, and (4) there is a basis for employer liability, such as knowledge or participation by supervisors. *See id.* Defendant focuses its argument on the second and third elements.

### a.    Harassment because of sex

Defendant argues that, to the extent plaintiff was harassed, she was not harassed because of her sex. According to defendant, Mueller was a demanding boss who may have had a tendency to manage employees in a "degrading and unprofessional" manner, but he treated men and women equally in that respect. (*See* Pl.'s Mem. in Opp'n, Ex. A, ECF No. 33 at 24.) As the Seventh

Circuit has explained, "Title VII does not cover the 'equal opportunity' or 'bisexual' harasser . . . because such a person is not *discriminating* on the basis of sex. He is not treating one sex better (or worse) than the other; he is treating both sexes the same (albeit badly)." *Holman v. Indiana*, 211 F.3d 399, 403 (7th Cir. 2000).

Plaintiff admits that Mueller's abuse was sometimes directed at men as well as women, but she asserts that women were his "predominant target," citing the complaint letters that she and other women submitted to Briggs human resources. (Pl.'s LR 56.1 Resp. ¶ 55.) As plaintiff correctly explains, harassment is actionable under Title VII if it is directed at a particular employee because of her sex, regardless of whether, in committing the alleged harassment, the harasser makes sexual advances or seems to be acting with regard for his own sexual gratification. *See Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 788 (7th Cir. 2007) ("Although most of [the harasser's] alleged comments were sexist rather than sexual, our precedent does not limit hostile environment claims to situations in which the harassment was based on sexual desire."). A person who treats both sexes badly might still violate Title VII if he treats employees of one sex even worse than those of the other, such that his harassment reveals a genuine "'antipathy to persons of the plaintiff's gender.'" *Holman*, 211 F.3d at 407 (Evans, J., concurring) (quoting *Shepherd v. Slater Steels Corp.*, 168 F.3d 998, 1008 (7th Cir. 1999)).

The accusations of harassment plaintiff makes against Mueller are characterized by allegations of bullying, intimidation, humiliating public criticism, and an overbearing, domineering management style. (*See id.* at ¶¶ 53-54.) There is nothing explicitly sex-based in them. Plaintiff admits that Mueller used overbearing, domineering management tactics against men as well as women; plaintiff admitted at her deposition that she overheard Mueller tell Brantman, someone of whom Mueller thought highly enough to promote, that "the only reason he

kept [Brantman] around was to use him as his punching bag." (Pl.'s Dep. at 227:10-24; *id.* Ex. 28.)

The evidence suggesting that Mueller's mistreatment of plaintiff was due to "genuine antipathy to persons of the plaintiff's gender" is insufficient to support her claim. Plaintiff made merely conclusory statements to that effect in the complaint letter she wrote to Young and Nordaas; the examples of misconduct she alleged against Mueller therein are not explicitly sexual or based on sex, nor did plaintiff describe disparate treatment of men that would permit an inference that Mueller's mistreatment of her was based on her sex. (*See* Pl.'s Dep. Ex. 28.) "The 'harassment' of which [plaintiff] complains could just as readily have been perpetrated upon a [man] without any alteration in its character or purpose." *See Beamon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 864 (7th Cir. 2005). "Accordingly," it is a stretch to "reasonably construe [Mueller's] actions as being motivated by hostility to" plaintiff's sex, *per se*. *See id.*

The joint complaint letter is no different except that it mentions that certain men, including Brantman and Liston, were promoted where women were not, but as the Court has already explained, plaintiff has not shown a triable issue of fact as to whether these comparators were similarly situated to women treated differently or whether Brantman and Liston were promoted based on anything other than their superior job performance, so any inference based on their disparate treatment would be flimsy at best. (*See id.*, Ex. 27.) Additionally, there is undisputed evidence (*viz.* the "punching bag" comment) that Brantman may have received similar mistreatment, despite his promotion and despite the fact that he was a man. Thus, the evidence of the work-performance-related harassment is not sufficient to support a reasonable inference that plaintiff was harassed because of her sex.

Plaintiff also adduces evidence of certain crude, sexist comments Mueller made to plaintiff about the physical appearance of other female employees. In some of these remarks, he contemplates terminating female employees because of their unattractive appearance. Considering that plaintiff was ultimately terminated, these comments may seem to cast Mueller's actions, even those that are "devoid of gender-specific indicia," in a different light, just as the Seventh Circuit explained that an alleged harasser's comments that "he ought to slap that woman sitting out there" or "I could slap that woman and get a promotion" suggested that "perhaps some of [the harasser's] alleged animus stemmed from [the plaintiff's] gender":

> This form of aggression is almost entirely limited to women . . . . To the extent any ambiguity remains, [the harasser] attached "that woman" to the end of the sentence, permitting a juror to conclude [the plaintiff's] gender was one factor leading to the outburst. And ***because the totality of a defendant's conduct underlies a hostile work environment claim, a jury is free to conclude that an animus towards [plaintiff's] sex motivated all of his aggression if it infers [plaintiff's] gender caused this comment***, which is one component of [the harasser's] alleged hostility.

*Hall v. City of Chi.*, 713 F.3d 325, 333-34 (7th Cir. 2013) (emphasis added).

But in this case, unlike in *Hall*, plaintiff was not the only employee Mueller supervised who suffered from his harassment, nor was she the only female he supervised. *Cf. id.* at 327-29. Mueller supervised numerous employees, male and female, and he appears to have mistreated many of them. As the Court has already explained, plaintiff offers only vague, generalized evidence or conclusory statements in support of her claim that Mueller harassed women more egregiously than men. *See Kaufmann v. Eppstein Uhen Architects, Inc.*, No. 13-CV-0674, 2015 WL 520616, at *2 (E.D. Wis. Feb. 9, 2015) (court "cannot infer differential treatment" because there was no "evidence as to how [the harasser] behaved toward males similarly situated to plaintiff," and "the available evidence indicates that [the harasser] was as aggressive toward male as female employees"); *see also Saboya v. Segerdahl Grp. Graphics*, 169 F. Supp. 3d 794, 800-02

(N.D. Ill. 2015) (distinguishing *Hall* and granting summary judgment for employer because a mere "handful of sexually tinged incidents," none of which bore "the hallmarks of truly egregious sex harassment," could "not reasonably support the inference that an anti-female animus motivated" the harassment, when "[n]early all of the incidents plaintiff complain[ed] about reflect[ed] ordinary work disputes"). In the end, plaintiff has not come forward with evidence that plaintiff was treated differently from male employees, and in the circumstances of this case, that means that she has not shown that she was harassed "because of" her sex.

### b. Severe or pervasive harassment

Even if plaintiff could prove that she was harassed because of her sex, the harassment she describes was not sufficiently severe or pervasive to create a hostile work environment under Title VII. Whether harassment is sufficiently serious to create the sort of hostile work environment that violates Title VII "turns on a constellation of factors that include 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Hostetler v. Quality Dining, Inc.*, 218 F. 3d 798, 808-09 (7th Cir. 2000) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). The harassment must be severe or pervasive from both a subjective and objective perspective; "[t]hat is, the plaintiff must subjectively believe that the harassment was sufficiently severe or pervasive to have altered the working environment, and the harassment must also be sufficiently severe or pervasive, from the standpoint of a reasonable person, to create a hostile work environment." *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 685 (7th Cir. 2010). "Offhand comments, isolated incidents, and simple teasing do not rise to the level of conduct that alters the terms and conditions of employment." *Adusumilli v. City of Chi.,* 164 F.3d 353, 361-62 (7th Cir. 1998).

The Court assumes that Mueller's conduct was subjectively serious and offensive to plaintiff, but it concludes that the alleged misconduct does not meet Title VII's standard for objectively severe or pervasive harassment. Mueller's explicitly "gender-based conduct"—his comments about other female employees' appearance—"was not objectively severe or pervasive" because it consisted of "sporadic" and "occasional inappropriate comments," which were "not physically threatening" and did not suggest that Mueller "was interested in [plaintiff] sexually." *See Scruggs v. Garst Seed Co.*, 587 F.3d 832, 841 (7th Cir. 2009); *cf. Kampmier v. Emeritus Corp.*, 472 F.3d 930, 941-42 (7th Cir. 2007) (harassment was sufficiently severe or pervasive because harasser "hugged [plaintiff] fifty to sixty times, jumped in her lap ten times, touched her buttocks thirty times, . . . made the comment that she could turn any woman gay ten to twelve times," and offered to perform sex act on plaintiff). Though uttered in conversation with plaintiff, Mueller's comments concerned the physical appearance of other employees, not plaintiff herself, and when such "indirect" comments are alleged to create a hostile working environment, the inference that they had an effect on the terms and conditions of the plaintiff's employment is "attenuated." *Yancik v. Hanna Steel Corp.*, 653 F.3d 532, 545 (7th Cir. 2011); *see Yuknis v. First Student, Inc.*, 481 F.3d 552, 554-56 (7th Cir. 2007) ("mere offense" may not rise to the level of "serious harassment" if plaintiff is not in the "target area" of offensive comments). Mueller's comments were the sort of "isolated incidents" that, because they were not "'extremely serious,' will not support a hostile work environment claim." *Ellis v. CCA of Tennessee LLC*, 650 F.3d 640, 648 (7th Cir. 2011) (quoting *Faragher v. Boca Raton*, 524 U.S. 775, 788 (1998)); *see Hart v. Forge Indus. Staffing Inc.*, No. 1:13-CV-094, 2014 WL 1316585, at *7-8 (S.D. Ind. Mar. 28, 2014) (seven comments making sexual advances or commenting on plaintiff's appearance "do not come close to the level of severity [required] . . . in numerous . . . cases in which the Seventh Circuit Court of

Appeals held that the offending conduct there did not even rise to the level of actionable sexual

harassment under Title VII") (citing *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430-31 (7th

Cir. 1995) and *Weiss v. Coca-Cola Bottling Co. of Chi.*, 990 F.2d 333, 337 (7th Cir. 1993)); *cf.*

*Lapka v. Chertoff*, 517 F.3d 974, 983 (7th Cir. 2008) ("[A]ssaults within the workplace create an

objectively hostile work environment for an employee even when they are isolated.").

The vast majority of the harassment plaintiff has described consists of overbearing

criticism of her work performance, but Mueller behaved the same way in that regard toward "both

male and female employees," and even when combined with his occasional sexist comments, this

conduct was not severe or pervasive enough to create a hostile work environment under Title VII.

*See Scruggs*, 587 F.3d at 841 (supervisor's sex-based statements that plaintiff was "made for the

back seat of a car" and looked like a "dyke," in combination with non-sex-based harassment about

"work habits" or "lack of sophistication," did not create a hostile work environment); *Clay v.*

*Credit Bureau Enters., Inc.*, 754 F.3d 535, 540-41 (8th Cir. 2014) (alleged work-performance

related harassment, considered along with five racially derogatory statements, was not sufficiently

severe or pervasive because incidents were "infrequent and involved low levels of severity," were

not physically threatening or humiliating, and plaintiff "relie[d] mostly on speculation and

conjecture to show that the alleged harassment was race-based"); *see also Milligan-Grimstad v.*

*Stanley*, 877 F.3d 705, 714 (7th Cir. 2017) (senior co-worker's persistent comments about

revealing outfits of women on television and frequent questions about plaintiff's pregnancy plans

and timing thereof did not create a hostile work environment), *Johnson v. Cty. of Cook*, No. 08 C

2139, 2012 WL 2905485, at *6-7 (N.D. Ill. July 16, 2012) (reviewing *Scruggs* and other cases for

"case-law guideposts" and concluding that supervisor's increased scrutiny of work hours and other

work-related conflicts with plaintiff following heated exchange over work schedule in which

supervisor told plaintiff to "go home and be a mother" did not create hostile work environment); *cf. Hall*, 713 F.3d at 331 (harassment was pervasive where harassing supervisor, over time, isolated plaintiff from co-workers to "ostracize" her and make her a "pariah, undeserving of human interaction").

Viewing the record in the light most favorable to plaintiff, Mueller's behavior was frequently uncivil toward plaintiff. But Title VII "does not set forth 'a general civility code for the American workplace.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). Only extreme misconduct creates a hostile work environment that violates Title VII; this high standard is necessary to "filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'" *Faragher*, 524 U.S. at 788 (quoting B. Lindemann & D. Kadue, Sexual Harassment in Employment Law 175 (1992)). Based on the evidence plaintiff has adduced, Mueller's behavior toward plaintiff does not meet this "demanding" standard. *Faragher*, 524 U.S. at 788.

Because a reasonable factfinder could not conclude that Mueller mistreated plaintiff because of her sex or that his mistreatment of plaintiff was sufficiently severe or pervasive to create the sort of hostile work environment that Title VII forbids, summary judgment for defendant is appropriate.[1]

---

[1] Because the Court has concluded that plaintiff has not come forward with evidence sufficient to state a *prima facie* case on her sexual harassment claim, the Court need not address defendant's argument that there is no basis for holding Briggs liable for Mueller's harassment because Briggs has established the elements of the *Faragher/Ellerth* affirmative defense: "(1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) . . . the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided." *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013) (citing *Faragher*, 524 U.S. at 807, and *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998)). But even if it were to reach the issue, it would conclude that the affirmative defense is not available to defendant in this case. The affirmative defense is only available "if no tangible employment action is taken"; otherwise the employer is "strictly liable." *Vance*, 570 U.S. at 424. Plaintiff was terminated, and termination is plainly a "tangible employment action." *See Ellerth*, 524 U.S. at 761.

## <u>CONCLUSION</u>

For the reasons set forth above, defendant's motion for summary judgment [22] is granted.

Civil case terminated.


**SO ORDERED**                                        **ENTERED: November 21, 2018**


**HON. JORGE L. ALONSO**
**United States District Judge**